# BARTON

**ATTORNEYS AT LAW**

711 Third Avenue
14th Floor
New York, NY 10017

(212) 687.6262  Office
(212) 687.3667  Fax

bartonesq.com

**MAURICE N. ROSS**
**DIRECT: 212.885.8845**
MROSS@BARTONESQ.COM

April 7, 2026

**VIA ECF FILING**
Hon. Edgardo M. Ramos
United States District Court
40 Centre Street, Courtroom 619
New York, NY 10007

> **Re:  *Dumbo Moving & Storage v. Piece of Cake Moving & Storage***
> **Index No. 1:26-cv-01378**

Dear Judge Ramos:

I write on behalf of Plaintiff DUMBO Moving & Storage Inc. ("Dumbo") in response to Defendant Piece of Cake's ("Defendant") counsel's pre-motion to dismiss letter dated March 30, 2026, ECF No. 15. Defendant's counsel apparently misunderstands the allegations in Dumbo's Amended Complaint, ECF No. 14 (the "AC"). While the AC does allege Defendant engaged in predatory pricing, it further alleges that the purpose of the predatory pricing was to obtain monopoly power, which Defendant then exercised to wrongly exclude competition through anticompetitive tactics designed to allow Defendant to dominate the relevant market (New York City moving companies) and extract profits by misleading consumers, disparaging Dumbo and other competitors, and engaging in illegal employment practices.  Thus, the AC alleges not only that there is a dangerous probability that Defendant will recoup its initial losses from predatory pricing, but also that by excluding competitors from the market, Defendant would cause ongoing and substantial harm to consumers. Defendant also ignores the relationship between the false advertising claims and the antitrust claims, and that the false advertising claims are an integral component of this lawsuit.

## I.    Plaintiff Has Stated Claims for Monopolization and/or Attempted Monopolization

Defendant admits that predatory pricing is a viable antitrust theory so long as there is a dangerous probability of recouping the initial losses incurred. That is precisely what the AC alleges. The AC alleges, with specific examples of money-losing conduct, that Defendant deliberately priced its services below the cost of doing business in order to obtain least half of the relevant market, and potentially up to 66%. *See* AC ¶¶9-29. Once Defendant had obtained sufficient market power, it used its market power illegally restrain competition to the detriment of consumers.  First, Defendant caused several large real estate management groups to work exclusively with Defendant and not its competitors by disparaging the quality of its competitors' services and falsely alleging that its competitors could not provide adequate insurance. *Id.* ¶¶ 32-42.  For example, the AC alleges that Defendant has entered into an agreement with Stellar

Hon. Edgardo Ramos
April 7, 2026
Page 2 out of 3

Management, which manages over eighty buildings in New York City, to become Stellar's exclusive mover, pursuant to which Stellar has blocked at least two of Defendant's largest competitors from its buildings, including Dumbo. *Id.* The AC also alleges that once Defendant had achieved enough market share to dominate the market, Defendant engaged in a series of unlawful labor practices, such as avoiding paying its movers minimum wage or benefits. *Id.* ¶52. These practices were made possible by Defendant knowingly misclassifying its movers as independent contractors of "crews," even though Defendant exercised substantial control over its movers. *Id.* ¶¶53-57. Defendant's unlawful labor practices are anticompetitive insofar that they permit Defendant to recoup its losses now that it has achieved sufficient market share to exclude the competition. *See SC Innovations, Inc. v. Uber Techs.,* 2020 WL 2097611, at *10 (N.D. Cal. May 1, 2020) (plaintiff stated plausible Sherman Act claims under a predatory pricing theory because it showed that defendant could recoup its losses by raising the price of "transactions to supracompetitive levels—through fare increases not fully passed on to drivers, commission increases reducing drivers' pay not offset by discounts for passengers, or a combination of two— while insulated by network effects from Lyft or a new market entrant usurping Uber's market share."). In addition, the AC alleges that as part of its scheme to obtain monopoly power, Defendant misled consumers by claiming that its pricing was "all inclusive", but in fact, it required consumers to pay mandatory hidden fees and surcharges, including, among others, mandatory tipping to "crew" members. AC ¶¶ 96-100. These hidden charges were disclosed to consumers by "crew" members only once the moves had begun, when consumers had no practical choice other than to pay the hidden charges. *Id.* Finally, one of the reasons that many customers were misled into using Defendant's moving services, despite the hidden fees, is because Defendant has engaged in an anticompetitive agreement with Yelp and other advertisers to minimize its competitors' advertising footprint while maximizing its own. *Id* ¶¶77-83. Indeed, Defendant publicly announced a partnership with Yelp, while its competitors were banned from the platform. *Id.* ¶¶78-82.

After obtaining monopoly power through predatory pricing, Defendant engaged in the acts described above, which have continued to unreasonably restrain competition in the market, in order to recoup its losses – precisely the gravamen of claims for monopolization and attempted monopolization. *See Kelco Disposal, Inc. v. Browning-Ferris Indus. of Vermont, Inc.*, 845 F.2d 404, 409 (2d Cir. 1988), *aff'd,* 492 U.S. 257 (1989); *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 143 (S.D.N.Y. 2016).

**ii. Dumbo has Properly Alleged that Defendant Violated Section I of the Sherman Act**

The agreements described above between Defendant and (i) building owners and employees, (ii) "crews" which employ Defendant's movers and (iii) advertisers are also sufficient to state claims for restraint of trade in violation of §1 of the Sherman act. Dumbo does not merely allege "parallel conduct," rather, for example, Dumbo alleges with specificity an actual agreement between Defendant and Stellar management, barring Dumbo and Flat Rate, a longstanding player in the moving industry and along with Dumbo, one of Piece of Cake's main competitors, from moving into its buildings, and only permitting Defendant. AC ¶¶ 32-42. Dumbo has further alleged that Defendant has entered into substantially similar agreements with no less than five other major real estate management organizations. *Id.* "It is well established, for example, that [c]oordination of horizontal agreements in restraint of trade… by entering into a series of identical vertical

Hon. Edgardo Ramos
April 7, 2026
Page 3 out of 3

agreements with multiple parties may subject all participants to antitrust liability." *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 486 (S.D.N.Y. 2012).

Similarly, Dumbo has alleged, as described above, that Defendant has entered into exclusive agreements with "crews" who contract with its movers to skirt labor laws, as well as advertisers, such as Yelp, to exclude competition in the market. AC ¶¶53-57, 77-83. And, when movers complain about their working conditions or attempt to work for a competitor, Defendant retaliated against them, sometimes with threats of violence. *Id* ¶60. These allegations go far beyond mere parallel conduct. *See Maxon Hyundai Mazda v. Carfax, Inc.,* No. 13–cv–2680 (AJN), 2014 WL 498826, at *10 (S.D.N.Y. Sept 29, 2014) ("Plaintiffs' allegations depict the exclusive dealing contracts here as neither so small in their effect on the market nor so plainly benign or beneficial to competition that they have failed to state a claim."); *Dial Corporation v. News Corporation,* 165 F.Supp.3d 25 (2016)("in conjunction with News Corp.'s exclusive contracts with retailers, Plaintiffs present evidence sufficient to withstand summary judgment that News Corp.'s exclusionary acts may be anticompetitive.")[1] This case is easily distinguishable from *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) where the plaintiff did not allege any agreement, and *Tese-Milner v. Diamond Trading Co.,* 2011 WL 4501336 (S.D.N.Y. Sept. 29, 2011), where the plaintiff alleged no factual support of agreement.

### iii. Dumbo Has Also Properly Alleged Gen. Bus. L. §§349 & 350 Claims

The claims that Defendant engaged in "all inclusive" false advertising are squarely directed to harms to consumers that have become an epidemic in a moving industry. AC ¶¶ 96-104. Consumers have long recognized that dealing with movers, in particular Defendant, is a frustrating process because of fraudulent and misleading pricing tactics which Defendant has magnified by obtaining monopoly market power. It is absurd that Defendant would not claim this conduct is sufficiently consumer oriented. It is well settled that "a plaintiff need neither be a consumer nor be someone standing in the shoes of a consumer to have an actionable claim under Section 349…'[t]he critical question ... is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer'" *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 218 (2d Cir.), *certified question accepted,* 100 N.Y.2d 636, 801 N.E.2d 417 (2003), and *certified question answered sub nom (quoting Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d at 264 (2d Cir.1995)).[2]

Respectfully submitted,

*/s/ Maurice N. Ross*

CC:    **All Counsel of Record via ECF**

---

[1] These cases were also inaccurately cited by Defendants, as throughout its letter, Defendant repeatedly cites to inapposite caselaw or mischaracterizes case law.  If the Court schedules full briefing, Dumbo will distinguish and accurately discuss the cited cases.

[2] Should this Court permit Defendant to make its proposed motion to dismiss, Dumbo requests 30 days to respond.